UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER DAWN WISEMAN,

    Case No. 13-14899

  Plaintiff,

    Paul D. Borman
v.    United States District Judge

    Mona J. Majzoub
COMMISSIONER OF    United States Magistrate Judge
SOCIAL SECURITY,

  Defendant.
_____/

## OPINION AND ORDER GRANTING COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 18) AND AFFIRMING THE COMMISSIONER'S DECISION

  Plaintiff Jennifer Dawn Wiseman ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") that denied both her application for disability insurance benefits and also her application for supplemental security income pursuant to the Social Security Act (the "Act"). Plaintiff, who is proceeding *pro se*, filed this action on November 27, 2013 stating that the underlying ruling was "not fair" and requesting this Court "open this case to see and follow through to be fair and objective". (ECF No. 1, Compl.). On July 9, 2014, Magistrate Judge Mona Majzoub issued an Order to Show Cause after Plaintiff failed to file a brief on the date provided by the scheduling order. (ECF No. 16). Magistrate Judge Majzoub allowed Plaintiff until July 31, 2014 to file her brief or risk dismissal. Plaintiff never filed a motion. The Commissioner filed its motion for summary judgment on September 25, 2014. (ECF No. 18).

  For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the Act is supported by substantial

evidence and was made pursuant to the proper legal standards. Therefore, the Court will grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision.

## I. BACKGROUND

A.   Procedural History

Plaintiff filed her applications for supplemental social security income and disability insurance benefits on February 28, 2011. (Tr. 11). Plaintiff claimed disability based on degenerative disc disease of the cervical spine with radiculopathy, chronic pain syndrome, obesity, affective disorder and a learning disability. (Tr. 13). Plaintiff alleged a disability onset date of June 18, 2010 in both of her applications. (*Id.*) These claims were initially denied on July 1, 2011 (Tr. 89-97) and Plaintiff then requested a hearing (Tr. 100-01). On June 6, 2012, ALJ Michael R. Dunn held a hearing during which Plaintiff appeared and testified. (Tr. 30-57). Plaintiff was represented by an attorney at the hearing and a vocational expert, Don K. Harrison, also appeared and testified. (Tr. 49-57).

On July 25, 2012, ALJ Dunn issued his decision and found Plaintiff was not disabled because while she could not perform her past work, she had the residual functional capacity to perform "less than the full range of sedentary work" subject to additional postural and manipulative limitations. (Tr. 15). This decision became the Commissioner's final decision when the Appeals Council declined Plaintiff's request for review on September 25, 2013. (Tr. 1-3). Plaintiff then filed the present action with this Court on November 27, 2013 (ECF No. 1, Compl.).

B.   Hearing Testimony

Plaintiff testified during the hearing before the ALJ that she was 36 years-old with an

eleventh grade education. (Tr. 33-35). Plaintiff noted that all of her classes in school were special education classes. (Tr. 35). Plaintiff also testified that she is five feet and five inches tall with a weight of 280 pounds and that there was had been no significant change in her weight over the last year. (Tr. 33-34). Plaintiff represented that she lived in a house with her mother and her eleven year-old daughter. (Tr. 33).

Plaintiff's attorney represented that Plaintiff was involved in an automobile accident in 2000 and those injuries eventually caused her to stop working in 2010. (Tr. 32).

Plaintiff testified as to her symptoms and pain explaining that she suffered from neck pain that radiated to her shoulder that caused hand numbness. (Tr. 37). Plaintiff also noted that she did not have pain elsewhere, but then later testified that she also had knee pain for which she used a cane. (Tr. 38, 40). Plaintiff noted, however, that she had never been told to use a cane by a doctor. (Tr. 40). Plaintiff identified that she suffered tingling in her left hand which happened on a daily basis. (Tr. 46). Plaintiff also described that she had numbness in her right arm and hand a couple of times a day that also caused her right hand to swell. (Tr. 46-47). Plaintiff noted that the numbness and tingling in her hands would generally last an hour or two and go away on its own, but that she submerged her right hand in cold water twice a day to help with the swelling. (Tr. 46-47). Plaintiff also testified that she could sit for thirty minutes at a time and stand for thirty minutes at a time. (Tr. 42, 45). Plaintiff explained that she spent two hours of her day in bed laying on her side and also described that position as being the most comfortable position for her. (Tr. 48). Plaintiff also explained that she could only walk one half a city block before she would need to rest. (Tr. 41). Plaintiff related that she had problems sleeping because of her pain and that she had low self-esteem that caused her to stay in and keep to herself. (Tr.

3

41-42). Plaintiff stated that her medications and her injections afforded her "a little bit" of relief. (Tr. 39).

Plaintiff testified that she has her driver's license but had not driven in the last two months because of difficulties driving related to the numbness in her right hand. (Tr. 34). Plaintiff clarified that she "usually walks". (*Id.*). Plaintiff worked part-time during 2011 babysitting for two small children (ages three and two). (Tr. 36).

As to her daily activities, Plaintiff testified that she led a very limited lifestyle and stated that her mother and her daughter performed all of the household chores, and at times she needed assistance bathing. (Tr. 42-44).

C.  Medical History

Plaintiff's attorney advised the ALJ during the hearing that her medical problems began after an automobile accident in 2000 and those injuries were degenerative in nature. (Tr. 32). Therefore, Plaintiff's attorney explained that while she was able to return to work after the accident she eventually had to stop working in June 2010 because of her impairments, although she did work briefly in 2011. (*Id.*).

The ALJ noted that the majority of Plaintiff's medical history predated her alleged disability onset date. (Tr. 16). The ALJ noted that Plaintiff's early medical record consisted primarily of complaints of right shoulder pain, neck pain, and sporadic knee pain attributable to the automobile accident in April 2000. (Tr. 16, 240-58, 261-71, 277-342). An X-ray of Plaintiff's right shoulder taken in October 2000 noted that there were "no acute, displaced fractures" but possible "joint effusion". (Tr. 256). In October 2000, Dr. Jeffrey Zacharias noted that she suffered from "right shoulder pain of unknown etiology" and ordered an MRI (Tr. 265).

Some seven months later, in July 2001, Plaintiff came for a follow up visit and the same doctor noted that she had not had the MRI as ordered because she was pregnant and that she had not attended physical therapy as prescribed. (Tr. 265).

An MRI was taken in August 2001 and the final impression was that "there was no significant findings and there is no evidence of internal derangement." (Tr. 270). There was also no rotator cuff tear and the MRI scan was "normal". (*Id.*). Dr. Jeffrey Zacharias also found that there was "no need for surgical intervention on her shoulder." (Tr. 271). Plaintiff's complaints of pain, muscle spasms and tenderness were treated with medications and she was prescribed physical therapy although only attended for a week. (Tr. 241-42, 252-58, 264-65, 266-71).

In March 2010, Plaintiff received an MRI scan which set forth in its findings that the "vertebral bodies demonstrate normal height and alignment" and the "marrow signal characteristics" and the cervical cord characteristics were within normal limits. (Tr. 473). The radiologist also noted his impression that the MRI scan evidenced "mild degenerative disc disease with small central herniations evident at multiple levels, but with no evidence of central canal stenosis" and "bilateral foraminal narrowing suggested at C6-C7." (Tr. 474).

Plaintiff also received epidural injections on no less than seven occasions: August 4, 2010 (Tr. 483); October 27, 2010 (Tr. 488); February 23, 2011 (Tr. 497); June 8, 2011 (Tr. 546); July 27, 2011 (Tr. 551-52); January 18, 2012 (Tr. 560-61); and February 22, 2012 (Tr. 566-67). Plaintiff also received facet joint blocks at multiple levels in her cervical spine and took Norco on a regular basis with no reported side effects. (Tr. 466, 497). Plaintiff reported on at least two occasions that her pain relief was adequate after receiving epidural injections and facet joint

5

blocks, and on another occasion Plaintiff reported that these procedures were "helpful". (Tr. 493, 498, 553).

Plaintiff received treatment from her primary care physician, Dr. Valerie Hudson, from 2002 through 2011. (Tr. 343-58; 454-65; 507-16; 517-19). In 2010, Plaintiff presented for a check up and was tearful and reported neck pain but the doctor provided that she was a "well adult" who suffered from migraines, obesity, hypertension, and depression. (Tr. 454). In 2011, Dr. Hudson diagnosed Plaintiff with back pain, depression, dysthymia, and anxiety. (Tr. 509, 519). Plaintiff was also referred to mental health counseling by Dr. Hudson, but apparently only attended counseling a couple of times. (Tr. 516).

Plaintiff also treated with a Dr. Pramod Kerkar at a pain clinic from 2010 through 2011. (Tr. 466-500). Dr. Kerkar diagnosed Plaintiff with cervical radiculopathy, facet joint disease, cervical disc herniation, degenerative disc disease, facet joint disease, facet joint hypertrophy, facet joint degenerative disc disease, whiplash injury level C4-T1, and a disc bulge at C5-T1. (Tr. 467, 470, 495). Dr. Kerkar also noted that upon physical examination that Plaintiff had some sensory deficit as well as tingling at C6-C7 and numbness in her upper extremities but her lower extremities were generally intact. (*Id*.).

On June 18, 2011, Plaintiff had a mental status examination by Nick Boneff, Ph.D. (Tr. 501-04). Dr. Boneff noted that Plaintiff had no mental health history beyond being placed on medication for her depression by her primary care physician. (Tr. 501). Plaintiff was described as obese and weighing 312 pounds but Dr. Boneff noted that she did not require any "means of support". (Tr. 502). Plaintiff reported to Dr.Boneff that she helped her mother care for her father who was afflicted with stage four cancer by administering medication and other light non-

6

physical tasks. (*Id*.). Plaintiff further reported that her depression was "well managed" with medication. (Tr. 501). Dr. Boneff assigned her a GAF score of 55 and concluded Plaintiff had mild learning disabilities affecting verbal comprehension and calculation skills as well as an adjustment reaction with disturbance of mood. (Tr. 503). Dr. Boneff further concluded that Plaintiff was not likely to be able to do activities involving complex verbal or written instructions but that she could do simple routine tasks at a sustained pace and appropriately interact with others in a social or work environment. (*Id*.).

D.   Vocational Expert Testimony

The Vocational Expert ("VE"), Don Harrison, identified and characterized three previous jobs performed by Plaintiff in the last fifteen years: a child monitor which was classified as light, and semi-skilled; a sales attendant, classified as a light, unskilled job; and an inspector, a light semi-skilled job. (Tr. 50).

The ALJ then set forth three different hypothetical questions to the VE, but ultimately relied only upon one hypothetical that limited a person to sedentary work with additional limitations. (Tr. 53-54). Specifically, the ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience, who was limited to sedentary work, to frequent use of hand controls with both hands, with no overhead reaching. (Tr. 51, 53-54). She could frequently reach in all other directions and perform frequent handling and fingering but could never climb ladders and scaffolds, and could only occasionally balance, stoop, kneel, or crouch and never climb. (Tr. 51). She must avoid exposure to excessive vibration, is limited to simple, routine and repetitive unskilled tasks. (Tr. 51-52). Finally, this person must have a sit/stand option but could not be off task for more than 10% of the time. (Tr. 53).

Given these parameters, the VE testified that a person would be capable of three types of representative positions: a sports equipment assembler of which there are 1,000 jobs regionally and 50,000 nationally; an optical inspector of which there are 1,200 jobs regionally and 60,000 nationally, or a surveillance monitor of which there are 1,500 jobs regionally and 75,000 nationally. (Tr. 53-54).

## II. STANDARD OF REVIEW AND LEGAL FRAMEWORK

"In Social Security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Act and therefore entitled to benefits." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(h)). This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). However, the Court's review under this statute is limited to determining whether those findings are supported by substantial evidence and made pursuant to proper legal standards. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ... "); *Cutlip v. Sec't of Health and Human Servs.*, 25 F.3d 284, 286 (1994) ("Judicial review of the Secretary's decisions is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (quoting *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009)); *see also McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (recognizing that substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.") (internal quotations omitted). "If the Commissioner's decision is supported by substantial evidence, we must defer to that decision, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (quoting *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005)).

This Court does not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip*, 25 F.3d at 286. Indeed, "[i]t is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (providing that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (citation omitted)).

Under the Act, Disability Insurance Benefits (for those qualifying wage earners who become disabled prior to the expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "[D]isability" is defined in the Act, as the: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

A.   ALJ's Application of Legal Framework

At step one, the ALJ determined that Plaintiff met the insured status requirements of the Act through June 30, 2013 and had not engaged in any substantial gainful activity since June 18, 2010, the alleged onset date of disability. (Tr. 13). At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine with radiculopathy; chronic pain syndrome; obesity; affective disorder and a learning disability". (Tr. 13).

The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14). To this end the ALJ noted that he considered the listed impairments of disorders of the spine, organic brain disorders, affective disorders, obesity as well as the social security rulings of 96-3p and 97-6p. (Tr. 14). Further, the ALJ evaluated Plaintiff's mental impairments and found that Plaintiff had only "mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration." (Tr. 14).

Because the ALJ determined that Plaintiff did not have a listed impairment, he went on to determine her residual functional capacity. (Tr. 15-20). At steps four and five of the analysis, the ALJ found that Plaintiff had the residual functional capacity to

> perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.976(a). The claimant can lift/carry and push/pull a maximum of 10 pounds; sit a total of about six hours in an eight-hour workday and stand/walk a total of about two hours in an eight-hour workday. The claimant must be able to shift positions from sitting to standing and vice versa at will without being off task for more than 10% of the workday. The claimant can frequently operate hand controls bilaterally; frequently reach in all directions, except for overhead which is never; she can frequently handle and finger bilaterally. She can occasionally balance, stoop, kneel and crouch, but never climb ladders, ropes or scaffolds or crawl. She must avoid exposure to excessive vibration. She is limited to simple, routine and repetitive unskilled tasks ...[s]he is limited to simple, work-related decisions.

(Tr. 15).

The ALJ then determined that Plaintiff could not perform any of her past relevant work as a child monitor, sales attendant, or inspector because she is limited to less than the full range of sedentary work. (Tr. 20). Finally, considering the Plaintiff's age, education, work experience, and residual functional capacity and relying on the testimony of the VE, the ALJ

concluded that there were significant numbers of jobs in the national and regional economy that the Plaintiff could perform. (Tr. 21-22). Accordingly, the ALJ found that the Plaintiff was "not disabled". (Tr. 21).

### III. ANALYSIS

Plaintiff set forth in the handwritten attachment to her Complaint that she feels that due to her medical conditions and her learning disability the ALJ was not fair or objective in his decision. (Compl. at *2). Plaintiff further asserted that she has to take medications to control her pain, and that she is limited in her daily activities, apparently inferring that the ALJ failed to take those facts into account in his decision. (*Id.*). The Court construes Plaintiff's complaint as one in which she asserts that the ALJ's decision was not based on substantial evidence.

Despite Plaintiff's argument that she was not fairly treated by the ALJ and that her medical condition and learning disability where not taken into consideration, it is clear from the ALJ's decision that all of her alleged conditions, especially her alleged mental impairments were thoroughly considered by the ALJ and reflected in his decision.

As set forth previously, the ALJ noted that Plaintiff suffered from the severe impairments of degenerative disc disease of the cervical spine with radiculopathy; chronic pain syndrome; obesity; affective disorder and a learning disability. (Tr. 13). Therefore, the ALJ did not overlook her mental impairments but rather accounted for them by determining the type of functional limitations that she suffered due to her learning disability and affective disorder. (Tr. 14). Indeed, he determined that those mental impairments caused her to have moderate difficulties in maintaining her concentration, pace and persistence. (Tr. 14). Additionally, the ALJ found that she had mild difficulties in maintaining social functioning and mild restrictions

in her daily living. (*Id*.). The ALJ based this evaluation on Dr. Boneff's examination in addition to Plaintiff's tearful mood, pain complaints and reported medication side effect of sleepiness and gave little weight to an earlier state psychological consultant's examination. (*Id*.).

The ALJ also specifically accommodated her medical conditions, including her testimony regarding her pain, in her residual functional capacity assessment. The ALJ noted that Plaintiff reported she suffered from neck pain that radiated to her shoulders as well as tingling and numbness in her hands, and that she had problems lifting or pouring milk or reaching overhead. (Tr. 15). The ALJ accounted for these manipulative allegations by limiting Plaintiff to lifting/carrying no more than 10 pounds; frequently operating hand controls bilaterally; frequently reaching in all directions except reaching overhead which was limited to never, and frequent handling and fingering bilaterally. (Tr. 15-16). The ALJ also accounted for Plaintiff's testimony regarding pain and that she sometimes needed a cane, could only walk for half a city block without rest, and could only sit or stand for thirty minutes at a time by providing Plaintiff a sit/stand option. (*Id*.). The ALJ also accounted for her complaints of pain by providing that Plaintiff must be allowed to shift positions at will without being off task for more than 10% of the day. (*Id*.). This is significant because there was no medical evidence to support Plaintiff's need for a cane and her testimony regarding her difficulties walking was contradicted by Dr. Hudson's notes indicating Plaintiff reported walking a half mile to and from school multiple times a day. (Tr. 516). Plaintiff's allegations that she suffered sleepiness as a side effect from her medication as well as her testimony that she tended to stay to herself, she previously took special education classes, and had difficulty with reading were all accounted by the ALJ in limiting Plaintiff to simple, unskilled work. (Tr. 14, 15-16). Finally, the ALJ considered

Plaintiff's obesity in conjunction with all of her impairments and as a result, limited Plaintiff to less than a full range of sedentary work. (Tr. 18).

As to Plaintiff's testimony regarding her daily living, the ALJ found some of her testimony inconsistent with both her own reported statements and the medical record and therefore not credible. Indeed, the ALJ noted that Plaintiff had divluged to Dr. Boneff that she helped her mother care for her father who was suffering from stage 4 cancer and "[s]he reported she administered medications and helped with light, nonphysical tasks. This suggests the claimant is capable of more than she alleged." (Tr. 18). Further, the ALJ noted that while he accounted for her testimony that she could not stand for long periods of time with a sit/stand option, Dr. Kerkar's recommendation that she receive attendant care were inconsistent with her comments that she was "able to assist with the care of her father, clean, organize and engage in light, nonphysical tasks" around the same time period. (Tr. 18).

Overall, the ALJ provided that Plaintiff was limited to sedentary work, the most restrictive of all the work categories, and then further limited her postural and manipulative abilities based on her testimony regarding her pain and symptoms.

The ALJ was also thorough in his treatment of the medical record and accurately summarized and considered the opinions of Plaintiff's doctors as well as the state consultive examiners. (Tr. 16-19). The ALJ summarized Dr. Hudson's opinion in his decision and noted the long treating relationship between her and Plaintiff. The ALJ noted that Dr. Hudson found her to be a "well adult" and that Plaintiff had not reported her knee pain, or her difficulty walking but rather related to Dr. Hudson that she walked a half mile to and from school multiple times a day (Tr. 16-17). The ALJ also noted Dr. Hudson's referral to mental health counseling,

that Plaintiff did not attend, and her general tearful affect. (Tr. 17). The ALJ further considered and accurately summarized the medical notes of Dr. Kerkar, Plaintiff's long treating pain specialist.

The ALJ then considered the opinion evidence which included the opinions of a state agency medical consultant, in addition to the opinions of Dr. Kerkar, Dr. Hudson, and Dr. Boneff. (Tr. 19-20). The ALJ assigned great weight to the state consultative examiner's opinion that Plaintiff could lift/carry and push/pull 20 pounds and frequently 10 pounds, site for a total of about six hours, and stand/walk for a total of six hours in a work day. (Tr. 19, 68-69, 81-82). However, the ALJ then accounted for Plaintiff's combination of impairments and history of shoulder pain and restricted range of motion by limiting Plaintiff to sedentary work and also her manipulative abilities. (Tr. 19).

The ALJ next evaluated Dr. Kerkar's 2011 medical source statement and assigned it little weight. He noted that Dr. Kerkar's opinion regarding Plaintiff's limitations on standing and walking, including that she needed a cane, were inconsistent with Plaintiff's statements to Dr. Hudson that she could walk half a mile to and from school multiple times a day. (Tr. 19). Further, the ALJ found Dr. Kerkar's opinion that Plaintiff had severe limitations (*i.e.* she could never look up, twist, stoop, crouch, squat, climb stairs, and rarely look down, turn her head or hold her head in a static position) was inconsistent with Plaintiff's reported relief from pain through medication, spinal injections and facet blocks. (*Id.*). Further, the ALJ noted that these severe restrictions were also at odds with the fact Plaintiff had worked watching small children and helped to care for her sick father after her alleged onset date of disability. (*Id.*). The ALJ also assigned little weight Dr. Kerkar's opinions in 2010 and 2011, where he opined regarding

15

similar severe restrictions and declared that Plaintiff was totally disabled for the same reasons. (*Id.*). The ALJ also correctly noted that Dr. Kerkar's opinion that Plaintiff was disabled is a determination reserved for the Commissioner. *See Kidd v. Comm'r of Soc. Sec.*, 283 Fed. App'x 336, 341 (6th Cir. 2008) (recognizing that "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner.").

The ALJ assigned great weight to the opinion of the state agency psychological consultant, Dr. Boneff, who found that Plaintiff suffered from an affective disorder and a learning disorder but that both impairments were nonsevere. (Tr. 20). The ALJ, however, noted Dr. Hudson's repeated notations regarding Plaintiff's sad and tearful affect and Dr. Boneff's comment that she should not engage in complex verbal or written instruction and only do simple, routine tasks. (*Id.*). Additionally, the ALJ considered Dr. Boneff's comment that she had mild learning disabilities that affected her verbal and calculation skills as well as adjustment reaction with disturbance of mood. In consideration of this evidence, the ALJ concluded that Plaintiff had severe mental impairments. (*Id.*).

Finally, the ALJ evaluated Dr. Hudson's 2011 medical source statement that provided Plaintiff had difficulties with her memory, ability to understand instructions, a marked limitation in her ability to complete a normal workday or week without interruptions from psychological symptoms. (Tr. 20). Despite these "marked" limitations, Dr. Hudson assigned Plaintiff a GAF score of 60 "which is indicative of only moderate symptoms". (*Id.*). Further, the ALJ acknowledged Dr. Hudson's long treating relationship with Plaintiff but noted that Dr. Hudson had only prescribed Plaintiff medication for her depression and did not refer her to mental health counseling until 2011 (less than 12 months before the hearing date). The ALJ held that these

facts undercut Dr. Hudson's opinion that Plaintiff suffered from such "marked" mental limitations. (*Id*.).

In light of all of these facts, the Court finds that there was substantial evidence in the record and reflected in the ALJ's decision to support his findings regarding Plaintiff's physical and mental limitations and his residual functional capacity assessment. Indeed, the ALJ's decision provides a thorough and accurate analysis of the record.

Additionally, the Court notes that the ALJ's step five finding is supported by substantial evidence where he properly supplied the VE with limitations based on substantial evidence and in turn relied upon the VE's testimony. The ALJ had posed multiple hypothetical questions to the VE which reflected all of the limitations that the ALJ determined to be applicable. To this end, the ALJ asked the VE to consider an individual of Plaintiff's age, education, and work history. (Tr. 51-53). Reflecting the ALJ's consideration of Plaintiff's mental and physical limitations, the ALJ also instructed the VE to limit that hypothetical person to sedentary work and additionally limit that individual to a sit/stand option. Further, accounting for the ALJ's findings regarding Plaintiff's mental impairments, the ALJ asked that the VE limit the hypothetical person to simple, routine, repetitive and unskilled tasks in addition to limiting the individual to simple work-related decisions. (Tr. 15, 21-22). The ALJ then accounted for Plaintiff's manipulative abilities and asked that the VE limit the hypothetical person to frequent use of hand controls with both hands, with no overhead reaching. (Tr. 15, 51, 53-54).

The VE concluded that given all these restrictions that such a hypothetical person could perform three types of representative positions: a sports equipment assembler of which there are 1,000 jobs regionally and 50,000 nationally; an optical inspector of which there are 1,200 jobs

regionally and 60,000 nationally, and a surveillance monitor of which there are 1,500 jobs regionally and 75,000 nationally. (Tr. 21, 53-54).

Where the ALJ provided the VE with limitations that were based on substantial evidence, the ALJ could properly rely upon the VE's testimony to find that there exist a significant number of jobs in the national economy that Plaintiff could perform. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (holding "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question".); *Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 516 (6th Cir. 2010) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."). Accordingly, the Court finds that the ALJ's step five findings is supported by substantial evidence.

## IV. CONCLUSION

For all these reasons, the Court grants the Commissioner's Motion for Summary Judgment (ECF No. 18) and AFFIRMS the Commissioner's decision.

IT IS SO ORDERED.

              s/Paul D. Borman
              PAUL D. BORMAN
              UNITED STATES DISTRICT JUDGE

Dated: March 11, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 11, 2015.

                                              s/Deborah Tofil
                                              Case Manager